UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

KRISTIN L. COTNOIR-DEBENEDETTO,

                          Plaintiff,

          -against-

UNIONDALE UNION FREE SCHOOL
DISTRICT, RHONDA TAYLOR, EDWARD
THOMAS, MYRTLE DICKSON, BEVERLY
WOLCOTT, and WILLIAM K. LLOYD,

                          Defendants.

**MEMORANDUM & ORDER
20-CV-5096 (NGG) (AYS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court is Defendants Uniondale Union Free School District (the "District"), Rhonda Taylor, Edward Thomas, Myrtle Dickson, Beverly Wolcott, and William K. Lloyd's (collectively, "Defendants") motion for summary judgment. (Mot. for Summ. J. ("Mot.") (Dkt. 37).) For the reasons that follow, the Motion is GRANTED.

## I.  BACKGROUND

### A.  Cotnoir-Debenedetto's Employment and Transfer

The following facts are undisputed except as noted and are taken from the Defendants' Rule 56.1 Statement and Plaintiff Kristin Cotnoir-Debenedetto's Counter-Statement. Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. Unless otherwise noted, where a party's Rule 56.1 statement is cited, that fact is undisputed or the opposing party has

not pointed to any evidence in the record to contradict it.[1] *See* Local Civil Rule 56.1(c), (d).

Cotnoir-Debenedetto is a 47-year-old white woman who has worked for the District as an English teach since 2007. (Defs. 56.1 Statement ¶¶ 1-2 (Dkt . 38); Pl. 56.1 Statement ¶¶ 1-2 (Dkt. 42).) She holds a Bachelor's Degree in English, a Master's Degree in Secondary Education, and is enrolled in a doctoral program; she is also certified as a "Secondary English teacher" for grades seven through twelve. (Defs. 56.1 Statement ¶¶ 22-23; Pl. 56.1 Statement ¶¶ 22-23.) She also has certifications as a school district leader and school building leader. (Defs. 56.1 Statement ¶ 24; Pl. 56.1 Statement ¶ 24.) Prior to working for the District, Cotnoir-Debenedetto worked as a substitute teacher for grades seven through twelve in another school district, and taught seventh grade as a student teacher. (Defs. 56.1 Statement ¶¶ 34-35; Pl. 56.1 Statement ¶¶ 34-35.)

Upon her hiring in 2007, Cotnoir-Debenedetto was assigned to work at Uniondale High School ("UHS"). (Defs. 56.1 Statement ¶ 25; Pl. 56.1 Statement ¶ 25.) During Cotnoir-Debenedetto's time at UHS, she never taught Advanced Placement (or AP) classes or elective classes. (Defs. 56.1 Statement ¶¶ 32-33; Pl. 56.1 Statement ¶¶ 32-33.) In the 2018-2019 school year, Cotnoir-Debenedetto taught Regents English and Honors English to the tenth grade. (Defs. 56.1 Statement ¶ 30; Pl. 56.1 Statement ¶

---

[1] Cotnoir-Debenedetto regularly disputes statements of fact in improper ways that the court need not consider. *See generally infra* Section III.A. No factual dispute is raised regarding statements in the Defendants' 56.1 Statement by legal arguments, statements contradicted by the evidentiary record (including the portions cited by Cotnoir-Debenedetto ostensibly in support of the claim), statements contradicted by Cotnoir-Debenedetto's own admissions, or additional context which does not contradict the Defendants' statement of fact. In those instances, the court has reviewed the underlying record and has considered the Defendants' relevant statement undisputed to the extent it is supported by the evidence.

30.) She requested to teach tenth grade English again for 2019-2020 when asked for her course preferences. (Defs. 56.1 Statement ¶ 36; Pl. 56.1 Statement ¶ 36.)

Dr. Rhonda Latty, who is not a party to this suit, has also been employed as a Secondary English teacher by the District. (Defs. 56.1 Statement ¶ 50; Pl. 56.1 Statement ¶ 50.) Dr. Latty is a 33-year-old Black woman. (Defs. 56.1 Statement ¶¶ 51-52, 145; Pl. 56.1 Statement ¶¶ 51-52.) She holds a Bachelor's Degree in Secondary English Education, a Master's Degree as a School Building Leader, and a Doctorate Degree in Educational Administration and Supervision, and is also certified to teach English to grades seven through twelve, as a school district leader, and as a school building leader. (Defs. 56.1 Statement ¶¶ 53-55; Pl. 56.1 Statement ¶¶ 53-55.) She has primarily worked at Lawrence Road Middle School ("LRMS") since her hiring in 2015, except for one year (the 2018-2019 school year) when she was involuntarily transferred to Turtle Hook Middle School ("THMS"). (Defs. 56.1 Statement ¶¶ 50, 58-65; Pl. 56.1 Statement ¶¶ 50, 58-60.) Prior to her time in the District, Dr. Latty taught "ninth grade home instruction" during a summer job at a charter school, student taught a tenth grade English class, and taught high school level English courses during night school. (Defs. 56.1 Statement ¶¶ 79-81; Pl. 56.1 Statement ¶¶ 79-81.)

Dr. Latty expressed a preference for teaching high school English at her interview and every year thereafter, but ended up teaching middle school. (Defs. 56.1 Statement ¶¶ 56, 71; Pl. 56.1 Statement ¶¶ 56, 71; Ex. D to Lineen Decl. (Dkt. 39-4) at 108:5-16 (referring to "Rhonda Antoine," Latty's maiden name).) In late 2018, Dr. Latty once again requested a transfer to UHS. (Defs. 56.1 Statement ¶¶ 69-70; Pl. 56.1 Statement ¶¶ 69-70; Ex. D to Lineen Decl. at 109:10-110:2.) Dr. Beverly Wolcott, the Director of English Language Arts, told Dr. Latty that she would review the request, and "considered whether a transfer of Dr. Latty to

Case 2:20-cv-05096-NGG-AYS   Document 46   Filed 06/29/23   Page 4 of 25 PageID #: 1203

UHS would be in the best interest of the students and the District at that time." (Defs. 56.1 Statement ¶¶ 13, 73-74; Pl. 56.1 Statement ¶¶ 13, 73-74.) In light of Dr. Latty's qualifications, strengths as a teacher, and the fact that (due to her one-year transfer to THMS) she would already be moving positions at the end of the year, Dr. Wolcott determined a move to UHS would be beneficial and raised the possibility with other members of District administration, who agreed. (Defs. 56.1 Statement ¶¶ 74-75, 77-78, 83-88; Pl. 56.1 Statement ¶¶ 74-75, 77-78, 83-88.)

Dr. Latty's transfer would leave a vacant position at LRMS, and Dr. Wolcott solicited volunteers to transfer to the middle school as required by the Collective Bargaining Agreement ("CBA"), but no one offered. (Defs. 56.1 Statement ¶¶ 89-91; Pl. 56.1 Statement ¶¶ 89-91.) Dr. Wolcott and Dr. Edward Thomas, the Principal at UHS at that time, discussed "who could be most seamlessly transferred to a middle school position," determining that transferring teachers responsible for a Senior elective, Advanced Placement classes, English as a New Language classes, co-taught classes, or special education classes would be overly disruptive to UHS. (Defs. 56.1 Statement ¶¶ 92-94; Pl. 56.1 Statement ¶¶ 92-94.) After eliminating those candidates, only four teachers remained, including Cotnoir-Debenedetto; the other three were determined to be worse fits than Cotnoir-Debenedetto for varying reasons (two due to specific roles they held at the school; one because her teaching methods were less suited to teaching middle school English). (Defs. 56.1 Statement ¶¶ 95-104; Pl. 56.1 Statement ¶¶ 95-104.) Two of these three other teachers were white. (Defs. 56.1 Statement ¶¶ 98, 103; Pl. 56.1 Statement ¶¶ 98, 103.) In addition to considering the impact of a transfer on UHS, Dr. Wolcott and Dr. Thomas determined that Cotnoir-Debenedetto had the skills and qualifications to be an asset to LRMS and its students. (Defs. 56.1 Statement ¶ 105; Pl. 56.1 Statement ¶ 105.)

Cotnoir-Debenedetto was formally notified of her transfer to
LRMS on May 7, 2019. (Defs. 56.1 Statement ¶ 112; Pl. 56.1
Statement ¶ 112.) She objected to the transfer because she did
not wish to teach middle school, did not feel that she had expe-
rience teaching middle school or the middle school state exam,
the transfer would impact her commute and her ability to pick
up her children from school, and she was more senior than other
teachers in her department. (Defs. 56.1 Statement ¶ 117; Pl. 56.1
Statement ¶ 117.) In addition to raising these concerns to the
District, she discussed options for relief with her union, who ulti-
mately did not to file a grievance. (Defs. 56.1 Statement ¶¶ 113-
14, 116; Pl. 56.1 Statement ¶¶ 113-14, 116.) Cotnoir-Debene-
detto did not raise a claim of discrimination at the time, (*see, e.g.,*
Defs. 56.1 Statement ¶ 122; Pl. 56.1 Statement ¶ 122), and as
she explained at her deposition, the possibility of discriminatory
intent only arose after she learned "who was taking my job"—
*i.e.,* Dr. Latty. (Ex. C to Lineen Aff. (Dkt. 39-3) at 40:14-19.) De-
spite Cotnoir-Debenedetto's concerns, the District employees
continued to believe it was in the best interests of the District and
the students, and offered resources for Cotnoir-Debenedetto to
rely on as the transfer went through. (*See* Defs. 56.1 Statement
¶¶ 117, 126, 129-31; Pl. 56.1 Statement ¶¶ 117, 126, 129-31.)

During her time at LRMS, Cotnoir-Debenedetto taught only sev-
enth grade English. (Defs. 56.1 Statement ¶ 141; Pl. 56.1
Statement ¶ 141.) Cotnoir-Debenedetto's transfer was not a de-
motion, did not affect her seniority within the District, did not
impact her salary or benefits, and, other than differences in cur-
riculum and the physical location of the workplace, did not
change her professional responsibilities. (Defs. 56.1 Statement ¶¶
133-38; Pl. 56.1 Statement ¶¶ 133-38.) Cotnoir-Debenedetto was
transferred back to UHS for the 2022-2023 schoolyear, three
years after her transfer to LRMS. (Defs. 56.1 Statement ¶ 142; Pl.
56.1 Statement ¶ 142.)

5

### B. Procedural Background

Cotnoir-Debenedetto filed this case on October 22, 2020. (Compl. (Dkt. 1).) She brings claims against the Defendants pursuant to Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), and the New York State Human Rights Law ("NYSHRL"). (*Id.* ¶¶ 5, 49.) The Defendants answered the Complaint on December 4, 2020. (Ans. (Dkt. 17).)

Following discovery, the Defendants filed this Motion for Summary Judgment. (*See* Mot.) The Motion was accompanied by a statement pursuant to Local Rule 56.1 (Defs. 56.1 Statement) and a Declaration from Caroline B. Lineen, counsel for Defendants, attaching 27 exhibits. (*See* Decl. of Caroline Lineen ("Lineen Decl.") (Dkt. 39) (attaching exhibits at Dkt. 39-1 to 39-27).) Cotnoir-Debenedetto filed a brief in opposition (Mem. in Opp. ("Opp.") (Dkt. 41)), along with a counterstatement of facts pursuant to Local Rule 56.1 (Pl. 56.1 Statement) and an affidavit of her own, but submitted no other exhibits. (Aff. of Cotnoir-Debenedetto (the "Cotnoir-Debenedetto Aff.") (Dkt. 43).) The Defendants filed a reply brief in further support of the Motion. (Reply Mem. ("Reply") (Dkt. 44).)

## II. LEGAL STANDARD

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).[2] "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A

---

[2] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

"genuine" issue of fact is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In ruling on a motion for summary judgment, the court must consider the facts "in the light most favorable to [the non-moving party]." *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the party seeking summary judgment meets its burden of showing that no genuine issue of material facts exists, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). To do so, the nonmoving party must cite to evidence in the record; "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010); *see also* Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]"). They "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommunications, Inc. v. W.R. Grace & Company-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996).

## III. DISCUSSION

### A. Cotnoir-Debenedetto's 56.1 Statement

Local Civil Rule 56.1 of the Southern and Eastern District of New York's Court Rules states that any opposition to a motion for summary judgment "shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civil Rule 56.1(b). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." *Id.* at 56.1(c). "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." *Id.* at 56.1(d).

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions[.]" *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir. 2001); *see also Sauro v. Costco Wholesale Corp.,* No. 18-CV-2091 (SJF) (AKT), 2019 WL 3046852, at *2 (E.D.N.Y. May 29, 2019) ("[T]he purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, and to assist the court in determining which facts are genuinely undisputed."). Nonetheless, a variety of issues in a Rule 56.1 Statement may oblige the court to consider the underlying record and disregard the statements made in the 56.1 Statement. For instance, where assertions in the 56.1 Statement are contradicted by the evidentiary record, the evidentiary record governs. *Holtz,* 258 F.3d at 74 ("[A] Local Rule 56.1 statement is not itself

a vehicle for making factual assertions that are otherwise unsupported in the record. Where . . . the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently."); *Wang v. State Univ of N.Y. Health Scis. Ctr. at Stony Brook*, 470 F. Supp. 2d 178, 186 (E.D.N.Y. 2006) (finding a claim made in a 56.1 statement that was contradicted by the factual record to be insufficient to establish pretext in an employment discrimination case). Where a party contradicts itself in its 56.1 Statement, the record also governs. *Parker v. City of Long Beach*, No. 11-CV-5412 (SJF) (WDW), 2013 WL 596624, at *1 n.2 (E.D.N.Y. Feb. 15, 2013), *affirmed in part and vacated in part on other grounds* 563 F. App'x 39 (2d Cir. 2014) (Summary Order) (concluding that officers had badges displayed where plaintiff admitted in one paragraph that officers were wearing badges but stated in another that they were not). A party's failure to dispute a specific fact stated in an opponent's 56.1 statement, if that fact is supported by the record, means that fact will be deemed admitted. *Giannulo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). Legal conclusions, of course, are not statements of fact and cannot dispute an opposing party's statements of fact. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015). Further, because evidence supporting statements in the Rule 56.1 Statement must be admissible, *see* Local Rule 56.1(d), citations to the Complaint fail to dispute a statement of fact. *See Advantage Title Agency, Inc. v. Karl*, 363 F. Supp. 2d 462, 465 (E.D.N.Y. 2005) (citing Fed. R. Evid. 56(e)).

Cotnoir-Debenedetto's 56.1 Counter-Statement violates each of these propositions at various times. Certain claims in Cotnoir-Debenedetto's 56.1 Statement are contradicted by other portions of the 56.1 Statement or by the record, including portions of the

record to which they cite. Most significantly, Cotnoir-Debene-
detto regularly disputes statements in the Defendants' 56.1
Statement on the grounds that she was not qualified for and had
no experience teaching middle school, citing only to various in-
stances when she herself disclaimed such qualifications. (*See* Pl.
56.1 Statement ¶¶ 74, 77, 83, 92, 105, 109, 124-25, 130, 133,
139, 158). That Cotnoir-Debenedetto stated this to the admin-
istration as a reason to rescind the transfer is undisputed, (Defs.
56.1 Statement ¶¶ 117, 119, 123: Pl. 56.1 Statement ¶¶ 117, 119,
123), but Cotnoir-Debenedetto elsewhere concedes (and the rec-
ord supports) the fact that she is "certified as a Secondary English
teacher to teach English *grades seven through twelve*" and that she
had previously served as a substitute teacher and student teacher
for middle school students. (Pl. 56.1 Statement ¶¶ 23, 34-35 (em-
phasis added).) Similarly, while Cotnoir-Debenedetto asserts
that Dr. Latty was unqualified to teach high school and had no
experience doing so (*see, e.g., id.* ¶ 145), she also concedes (and
the record supports) the fact that Dr. Latty had the same certifi-
cation as Cotnoir-Debenedetto, and was a student and night
teacher for high school English. (*Id.* ¶¶ 23-24, 54-55, 80-82.) In
light of these contradictions within Cotnoir-Debenedetto's own
56.1 Statement, the court considers it undisputed that Cotnoir-
Debenedetto told the District that she lacked the qualifications
and experience to teach middle school, but she was qualified to
do so and had some past experience, and similarly, that Dr. Latty
was qualified to teach high school and had some past experience
doing so. The court adopts the same approach in all instances
where Defendants' 56.1 Statement is supported by the record
and Cotnoir-Debenedetto's response is contradicted by the record
or her own 56.1 Statement.[3]

---

[3] Another significant example of Cotnoir-Debenedetto's flexible approach
to the evidence is that she claims that "elective classes were not considered

Next, the 56.1 Statement is replete with purported disputes of facts where Cotnoir-Debenedetto's response simply make conclusory legal arguments rather than citing admissible evidence to the contrary. For instance, in response to the Defendants' statement that "[d]uring the 2018-19 school year, the plaintiff did not have any inclusion classes," (Defs. 56.1 Statement ¶ 31), Cotnoir-Debenedetto concedes that she "never taught inclusion classes," but nonetheless "dispute[s]" the statement because it "is irrelevant to Plaintiff retaining her position at UHS since Defendants were not even sure of which teachers actually taught these classes." (Pl. 56.1 Statement ¶ 31; *see also, e.g., id.* ¶ 32 (stating the same regarding Advanced Placement classes); *id.* ¶ 33 (elective classes).) This is not a factual dispute; it is a legal argument regarding whether the Defendants' stated reasons for the transfer were mere pretext. Cotnoir-Debenedetto "dispute[s]" other statements of fact because they "do[] not absolve Defendants from

---

when the District made transfer decisions," citing to Dr. Wolcott's deposition. (Pl. 56.1 Statement ¶ 99.) The relevant portion of Dr. Wolcott's deposition states the opposite, but clarifies that there was no official policy requiring the approach taken:

> Q. Okay. And why was it your determination that teachers in the high school who taught these specific classes that you referenced were not candidates to be transferred to the middle school?

> A. *In the case of senior electives,* they are typically designed and created by the teacher who is teaching them so they have intimate knowledge of the curriculum. The co-taught classes are like a marriage and we try to keep them consistent.

> Q. Is there any state-mandated policy or guidelines that would have prohibited you from transferring teachers from the high school who taught senior electives to the middle school?

> A. No.

(Ex. D to Lineen Aff. at 63:14-64:9 (emphasis added).)

liability in this case." (*See, e.g., id.* ¶¶ 38-39.) In still other contexts, Cotnoir-Debenedetto disputes statements of fact because discrimination on the basis of race or age is not allowed by the union contract or law. (*See, e.g., id.* ¶ 66 (disputing that the CBA allows for involuntary transfers because it "does not allow for involuntary transfers on the basis of her race or age"); *see also id.* ¶ 74 ("Disputed because this does not justify the discriminatory transfer of Plaintiff[.]".); *id.* ¶¶ 77-78, 83-85(1), 110-11, 114, 120, 122, 126, 128-29, 142, 151-56, 158-67, 175-79.) Such argumentative (and at times conclusory) statements are not appropriate for a Rule 56.1 Statement, and do not create a factual dispute as to the contentions made in the Defendants' 56.1 Statement. Accordingly, to the extent Defendants' relevant statements are supported by the record, and Cotnoir-Debenedetto contests them with solely legal conclusions, such statements are deemed undisputed.

Cotnoir-Debenedetto's 56.1 Statement also, in many instances, purports to dispute statements of fact by providing what she presumably believes is additional context or information. (*See, e.g.,* Pl. 56.1 Statement ¶¶ 7, 10, 37, 86, 89.) Under the Local Rules, such additional facts should be included in a Counterstatement of Additional Disputed Facts, to which the Defendants may have received the opportunity to reply. *See* Local Civil Rule 56.1(b). They do not, however, create factual disputes of the assertions made in the Defendants' 56.1 Statement. For instance, as material to the discussion below, the Defendants state that "when Dr. Latty applied for the position in the District, she thought she was applying for and being interviewed for a high school position." (Defs. 56.1 Statement ¶ 57.) Cotnoir-Debenedetto responds that "while Dr. Latty may have 'assumed' this, she admitted that she could not recall ever discussing her preference for teaching high school . . . during the interview process." (Pl. 56.1 Statement ¶ 57.) As Defendants do not state Dr. Latty was told she was interviewed for a high school position, Cotnoir-Debenedetto's

response fails to actually dispute the statement of fact.[4] In another instance, Cotnoir-Debenedetto "dispute[s]" the role of Ms. Rhonda Taylor, the Assistant Superintendent for Curriculum and Instruction for the District, in reviewing and approving of Dr. Latty's transfer because "Ms. Taylor acknowledged that the transfer would be difficult on Plaintiff, especially because it was involuntary, and told Plaintiff she would speak to [human resources] about the resulting hardship, but this did not prevent the unwanted transfer." (Pl. 56.1 Statement ¶ 86.) A third example relevant to the merits of this Motion appears when Cotnoir-Debenedetto "dispute[s]" that Dr. Latty's transfer left an open position at LRMS "because the resulting vacancy did not necessarily need to be filled by the transfer of a high school teacher, and could have been accomplished by an outside hire." (Pl. 56.1 Statement ¶ 89.) In such contexts, the court deems the Defendants' statements undisputed, and will consider the additional context or information included by Cotnoir-Debenedetto only if supported by the underlying record.

Finally, Cotnoir-Debenedetto cites to the Complaint on several occasions. (*See* Pl. 56.1 Statement ¶¶ 104, 117, 119, 125-27). Such citations are not to admissible evidence and are thus improper. *Walsh v. Dejoy*, No. 14-CV-7239 (GBD) (KNF), 2021 WL 4896979, at *8 n.1 (S.D.N.Y. July 28, 2021) (R&R) ("The parties' Rule 56.1 statements contain, improperly, citations to the second amended complaint, which is not evidence[.]"). Accordingly, the court considers the relevant statements by the Defendants undisputed, to the extent supported by the record.

---

[4] Further, Cotnoir-Debenedetto's citation to the underlying record illustrates that this claim is misleading at best: Dr. Latty testified that her "assumption" was based on the fact that she "applied for a high school position," and in the interview "the scenarios that [she] has to answer w[ere] for a high school position and for [her] demo lesson, it was in a high school classroom[.]" (Ex. I to Lineen Decl. (Dkt. 39-9) at 23:16-24.)

These failures are so extensive and permeate such a significant proportion of Cotnoir-Debenedetto's 56.1 Statement that the court would be within its authority to deem the corresponding majority of the Defendants' 56.1 Statement undisputed even without consultation of the underlying record. *See* Local Civil Rule 56.1(c) (stating that each statement not "specifically controverted by a correspondingly numbered paragraph" in the opposing party's statement will be deemed admitted). Nonetheless, the court has opted to review the underlying record and determine the undisputed facts thereon, notwithstanding Cotnoir-Debenedetto's conclusory or otherwise legally deficient disputes. *See Holtz*, 258 F.3d at 73 (noting that a district court "may in its discretion opt to conduct an assiduous review of the record" where one party has failed to file a 56.1 statement).

## B.   Service of Dr. Wolcott

Defendants first argue that summary judgment must be granted on all claims against Dr. Wolcott because Cotnoir-Debenedetto never served Dr. Wolcott in this case. (Mot. at 4-5.) Dr. Wolcott did not move to dismiss the complaint for lack of service, but asserted lack of personal jurisdiction due to improper service as an affirmative defense in the Answer. (Ans. at 10.) Cotnoir-Debenedetto concedes that service was never effected on Dr. Wolcott, (Pl. 56.1 Statement ¶¶ 175-76), but argues that the defense has been waived by Dr. Wolcott's ongoing participation in the case, including by appearing without moving to dismiss and sitting for a deposition. (*Id.*; Opp. at 4-6.)

Under the Federal Rules of Civil Procedure, a defendant must be served within 90 days of filing of the complaint, or else the action will be dismissed without prejudice. Fed. R. Civ. P. 4(m). Timely service of a defendant is necessary for personal jurisdiction over that defendant. *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). Nonetheless, a defendant may waive all defenses of personal jurisdiction through conduct, including

"extensive participation in the discovery process." Charles Alan
Wright & Arthur R. Miller, 5C Fed. Prac. & Proc. Civ. § 1391 (3d
ed.) This includes a defense of lack of service. *Datskow v. Tele-
dyne, Inc., Cont'l Prods. Div.*, 899 F.2d 1298, 1303 (2d Cir. 1990).

Accordingly, Dr. Wolcott's active participation in this litigation,
including sitting for a deposition, waived the defense of lack of
service notwithstanding its assertion in the Answer. *See Hamilton
v. Atlas Turner, Inc.* 197 F.3d 58, 62 (2d Cir. 1999).

### C.   Cotnoir-Debenedetto's Federal Claims

#### 1.   Racial Discrimination

Cotnoir-Debenedetto brings a claim for race discrimination pur-
suant to Title VII, arguing that she was transferred to LRMS
because she is white.[5] (Opp. at 1; Compl. ¶¶ 5, 49.) Such claims
are analyzed pursuant to the burden-shifting framework estab-
lished in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-
804. This framework provides a three step process: *first*, the
plaintiff must establish a *prima facie* case of racial discrimination
by showing four elements: (1) that she belongs to a protected
class; (2) she was qualified for the position held; (3) she suffered
an adverse employment action; and (4) the adverse employment
action "occurred under circumstances giving rise to an inference

---

[5] Cotnoir-Debenedetto brings the same claim for race discrimination pur-
suant to the NYSHRL. (Compl. ¶¶ 5, 49.) "Claims brought under the
NYSHRL are analyzed identically and the outcome of an employment dis-
crimination claim made pursuant to the NYSHRL is the same as it is under
Title VII." *Costabile v. N.Y. Dist. Council of Carpenters*, No. 17-CV-8488,
2018 WL 4300527, at *6 (S.D.N.Y. Sept. 10, 2018). The analysis that fol-
lows regarding Cotnoir-Debenedetto's Title VII claim therefore applies
coextensively to her claim under New York state law, and because the court
grants summary judgment on the merits, there is no occasion to address
the Defendants' procedural arguments regarding NYSHRL statutory condi-
tions precedent. (*See* Mot. at 6-7.)

of discriminatory intent."[6] *Smith v. N.Y. & Presbyterian Hosp.*, 440
F. Supp. 3d 303, 328 (S.D.N.Y. 2020) (quoting *Brown v. City of
Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012)). *Second*, after the
plaintiff establishes a *prima facie* case by showing each of these
four elements, the burden shifts to the employer "to articulate
some legitimate, nondiscriminatory reason" for the adverse em-
ployment action. *McDonnell Douglas*, 411 U.S. at 802. *Third*, if
the employer is able to show such a nondiscriminatory reason,
the burden returns to the plaintiff to show the reason was mere
pretext for discrimination. *Id.* at 804.

"An inference of discrimination can arise from circumstances in-
cluding, but not limited to, the employer's criticism of the
plaintiff's performance in ethnically degrading terms; or its invid-
ious comments about others in the employee's protected group;
or the more favorable treatment of employees not in the pro-
tected group; or the sequence of events leading to the plaintiff's
discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d
Cir. 2015). In other words, evidence giving rise to an inference
of discrimination may be direct (use of racial epithets, invidious
comments regarding the protected class, or similar behavior) or
indirect (*i.e.*, a showing that the claimant was treated disparately
from similarly situated persons outside the claimant's protected
class). *Roginsky v. M&T Bank*, No. 19-CV-1613 (LJV) (JJM), 2022
WL 2671707, at *10 (W.D.N.Y. June 21, 2022).

The record does not reflect, nor does Cotnoir-Debenedetto rely
on, any direct evidence of discrimination. No one at the District,
whether a named Defendant or otherwise, purportedly ever

---

[6] Although the *prima facie* case is the plaintiff's burden, on a motion for
summary judgment, the movant—here the Defendants—must establish
there is no genuine dispute of material fact. The motion for summary judg-
ment may therefore only be granted if the Defendants show that, on the
undisputed facts, a reasonable jury could not conclude that Cotnoir-
Debenedetto could prove one of the elements of the *prima facie* case.

made any remark regarding Cotnoir-Debenedetto's race or white teachers in general. Instead, she argues that an inference of discrimination can be gleaned from the fact that Dr. Latty is Black and the District (and New York state) has a general policy of pursuing diversity among its teaching staff.[7] (*See* Opp. at 2 ("Worse yet, Defendants replaced Plaintiff with Dr. Rhonda Antoine (née Latty), a younger African-American middle school teacher, based on their reliance upon a New York State diversity initiative."); *see also* Ex. C to Lineen Aff. at 131:13-18 ("I believe because she is African American she was basically receiving special treatment and she didn't have to go through the same procedures that I would have to go through.").) Cotnoir-Debenedetto is explicit on the first point: as she explained in her deposition, she raised no complaints of discrimination until she learned "who was taking my job"—*e.g.*, a Black woman. (Ex. C to Lineen Aff. at 40:14-19.) She adds that, because (in her opinion) Dr. Latty had no qualifications or experience for teaching high school, like herself, the only possible explanation for Dr. Latty's transfer was discriminatory. (*See* Opp. at 17.)[8]

---

[7] Cotnoir-Debenedetto makes passing reference to the more favorable treatment of non-white employees, since Dr. Latty received her preferred placement while Cotnoir-Debenedetto was involuntarily transferred. (*See, e.g.*, Opp. at 17.) "A plaintiff may raise [an inference of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). But Dr. Latty was transferred involuntarily a year earlier, showing the opposite. (Defs. 56.1 Statement ¶¶ 59-65; Pl. 56.1 Statement ¶¶ 59-65.) Another Black teacher at UHS was transferred to a middle school in 2014 as well. (*See* Ex. K to Lineen Aff. (Dkt. 39-11) at ¶ 13.) Accordingly, the undisputed record reflects that both white and nonwhite teachers were involuntarily transferred pursuant to the terms of the Collective Bargaining Agreement.

[8] As discussed above, Cotnoir-Debenedetto concedes that she and Dr. Latty had the same certification, covering grades seven through twelve, and Dr.

Regarding the diversity policy, Cotnoir-Debenedetto stated at her deposition that the District had a "goal of promoting African Americans" that was "widely known" and effectuated through the District's directing the members of hiring committees to hire specific applicants over others on the basis of race. (Ex. C to Lineen Aff. at 108:15-19, 113:5-13.) But she conceded that when she served on a hiring committee, she was not instructed to this effect; she had never seen any documents reflecting such a policy; and had no recollection of which teachers had told her of this instruction or any position which she heard was offered because of the candidate's race. (*Id.* at 113:14-117:17.)[9] Dr. Wolcott, for instance, agrees that New York state has a general policy of promoting diversity in education, meaning "that they're looking for students to encounter a wide variety of types of people that they encounter as their educators, their administrators, other staff in the building in districts throughout New York State," but the various Defendants could not recall any discussions of diversity specific to the UHS English department or Cotnoir-Debenedetto

---

Latty had some limited experience teaching high school English before beginning her position at LRMS.

[9] Cotnoir-Debenedetto also stated that, after she learned Dr. Latty was her replacement, she found a document on the school server which "list[ed] the number of minority teachers verses non-minority teachers in the district." (Ex. C to Lineen Aff. at 108:20-112:8.) Other deposition testimony discussed District presentations regarding the demographics of the District's students and teachers. (Ex. D to Lineen Aff. at 164:4-21, 168:6-69:9 (discussing document that showed two percent of the student body is white, as compared to 61 percent of the teachers).) None of these documents appear to be in the evidentiary record, though, and while Dr. Wolcott stated that they were related to a "conversation about diversity recruitment," (*id.* at 167), Cotnoir-Debenedetto testified that she never learned who created the document she saw or why. (Ex. C to Lineen Aff. at 112:5-8).

in particular. (Ex. D to Lineen Aff. at 100:15-102:12.)[10] "To infer
from those generalized statements that [Defendants] deliber-
ately terminated [P]laintiff to make room for a minority
employee would not be reasonable." *Blanke v. Rochester Tel.
Corp.*, 36 F. Supp. 2d 589, 597 (W.D.N.Y. 1999).[11]

Accordingly, the relevant question is whether a transferred em-
ployee's replacement by an individual outside their protected
class is sufficient on its own to give rise to an inference of dis-
crimination. Courts in this Circuit have split on this issue.
*Compare Zimmerman v. Assocs. First Cap. Corp.*, 251 F.3d 376,
381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced

---

[10] Cotnoir-Debenedetto cites this portion of Dr. Wolcott's deposition as a
concession that "personnel decisions, including Plaintiff's and Dr. Latty's
transfers, were made in accordance with Defendants' 'priority' to achieve a
more ethnically diverse faculty and one that more closely matches the ra-
cial makeup of the students." (Opp. at 17-18 (citing Ex. D to Lineen Aff. at
101-03, 168-69).) Neither the cited portions of the deposition transcript,
nor any other part of Dr. Wolcott's deposition, states that "Plaintiff's and
Dr. Latty's transfers were made in accordance with" a goal of representing
the student body's demographics in the faculty.

[11] In *Blanke*, the court explained that the diversity statements in question
articulated a "broad goal of increasing the number of minority employees
within its ranks" and "managers should be on the lookout for, or actively
recruit, minority candidates when positions did become open," but "con-
tain no suggestion that white employees would be terminated in order to
effectuate that goal." 36 F. Supp. 2d at 597-98. Robert Rodriguez, the Dis-
trict's Assistant Superintendent for Human Resources, attested that "[t]he
effort to recruit diverse applicants and candidates for employment with the
District and to reach groups historically unrepresented in the education
field is just that, recruitment of potential employees. It does not mean that
the District made or makes actual employment decisions based on race,
national origin, gender, age, religion, or any other protected characteris-
tic." (Ex. K to Lineen Aff. at ¶ 18.) As discussed above, Cotnoir-Debenedetto
could not point to any document or testify to any instruction received by
any member of a District hiring committee to the contrary, including from
her own experience serving on a hiring committee.

by someone outside the protected class will suffice for the re-
quired inference of discrimination at the *prima facie* stage of the
Title VII analysis.) *with Duviella v. JetBlue Airways*, 353 F. App'x
476, 478 (2d Cir. 2009) (Summary Order) ("[T]he fact that the
promotions in question were given to younger people of a differ-
ent race is not sufficient, standing alone, to allow Duviella to
carry his ultimate burden of proving discrimination."). In *Zim-
merman*, the Second Circuit explained that the burden to show a
*prima facie* case is "minimal" and "*de minimis*,"251 F.3d at 381,
and although the plaintiff's evidence of discrimination (founded
solely on the sex and age of the plaintiff's replacement) was
"slight," that was enough to meet the low bar. *Id.* at 382; *see also
Perretti v. Bank*, No. 11-CV-3925 (BMC), 2012 WL 2458137, at
*7 (E.D.N.Y. June 17, 2012) (distinguishing *Zimmerman*, an ap-
peal from a jury verdict, on procedural grounds and because
Zimmerman provided significant "circumstantial evidence of dis-
criminatory animus").

In any event, while Cotnoir-Debenedetto may have cleared the
"minimal" bar of a *prima facie* case,[12] she has failed to raise any
genuine dispute of material fact regarding whether the Defend-
ants' reasons for the transfer were mere pretext. In *Zimmerman*,
the Circuit explained that courts must "consider a number of fac-
tors including 'the strength of the plaintiff's prima facie case, the
probative value of the proof that the employer's explanation is
false, and any other evidence that supports the employer's case
and that properly may be considered on a motion for judgment
as a matter of law.'" 251 F.3d at 381 (quoting *Reeves v. Sanderson
Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000)). "[A]n em-
ployer would be entitled to judgment as a matter of law if the

---

[12] The court does not decide whether the evidence could lead a reasonable
fact finder to conclude the other three elements of the *prima facie* case have
been met.

20

record conclusively revealed some other, nondiscriminatory rea-
son for the employer's decision, or if the plaintiff created only a
weak issue of fact as to whether the employer's reason was un-
true and there was abundant and uncontroverted independent
evidence that no discrimination had occurred." *Reeves*, 530 U.S.
at 148 (discussing standard on post-trial review under Federal
Rule of Civil Procedure 50); *see also Howard v. Port Auth. of N.Y.
& N.J.*, 771 F. App'x 130, 132 (2d Cir. 2019) (Summary Order)
(applying *Reeves* to affirm grant of summary judgment where the
evidence could not lead a reasonable trier of fact to conclude that
"the most likely alternative explanation" for employer's conduct
was discrimination).

The Defendants' explanation for the transfer is clear and con-
sistent throughout the evidentiary record. Dr. Latty had
repeatedly requested a high school position since her hiring.
(Defs. 56.1 Statement ¶¶ 56, 71; Pl. 56.1 Statement ¶¶ 56, 71.)
The Defendants determined that the time for a transfer was right
for the 2019-2020 school year, as Dr. Latty would already be
moving positions at the conclusion of her year at THMS. (Defs.
56.1 Statement ¶ 74; Pl. 56.1 Statement ¶ 74.) Dr. Latty seemed
a good candidate for teaching at UHS, based on her general qual-
ifications and qualities, but in particular due to "her effective use
of a technique known as 'Station Learning,' and her strong focus
on fostering independence in learning, thinking and research
with her students." (Defs. 56.1 Statement ¶ 75; Pl. 56.1 State-
ment ¶ 75.) [13] After unsuccessfully seeking volunteers for a

---

[13] "Station Learning" is a method of teaching that had originally started in
the District's elementary schools, was then implemented in the middle
schools, and by the 2018-2019 school year was used by some math and
science teachers at UHS, which sought to expand the method. (*See* Ex. F
to Lineen Aff. (Dkt. 39-6) at 48:9-17, 53:20-55:3; *see also, e.g.,* Ex. G to
Lineen Aff. (Dkt. 39-7) at 24:13-16.) Cotnoir-Debenedetto argues that Sta-
tion Learning was not a consideration for transfers, citing to a portion of

transfer, the Defendants sought to determine which UHS teacher should be correspondingly transferred. (Defs. 56.1 Statement ¶¶ 89-91; Pl. 56.1 Statement ¶¶ 89-91.) To do so, the Defendants first eliminated all teachers within the English department who taught classes which, for a variety of reasons, necessitated that teacher's individual involvement. (Defs. 56.1 Statement ¶¶ 92-94; Pl. 56.1 Statement ¶¶ 92-94.) This process left four candidates, including Cotnoir-Debenedetto; the other three candidates either held specific roles at UHS that the Defendants wanted to retain (such as senior class adviser) or were not suited to middle school instruction. (Defs. 56.1 Statement ¶¶ 95-104; Pl. 56.1 Statement ¶¶ 95-104.) Cotnoir-Debenedetto, on the other hand, had strong organizational skills and taught structured classes, among other qualities that would make her an asset to the middle school students. (Defs. 56.1 Statement ¶ 105; Pl. 56.1 Statement ¶ 105.) Far from a reflection of the Defendants' negative views of Cotnoir-Debenedetto, they consistently explained at depositions and in affidavits their belief that Cotnoir-Debenedetto's skills as a teacher would benefit the middle school students, and therefore the transfer—even if not Cotnoir-Debenedetto's preference—would serve the interests of the District and its constituent students. (*See* Ex. D to Lineen Aff. at 172:4-12; Ex. E to Lineen Aff. (Dkt. 39-5) at ¶ 43; Ex. F to Lineen Aff. at 55:4-13; Ex. G to Lineen Aff. at 59:10-60:13; Ex. H to Lineen Aff. (Dkt. 39-8) at 24:4-15, 36:8-37:6.) As Ms. Myrtle

---

Ms. Taylor's deposition transcript which includes no discussion of the factors considered for transfers. (*See* Pl. 56.1 Statement ¶ 75 (citing Ex. D to Lineen Aff. at 54:19-55:3).) The only portion that could arguably lead to the conclusion that "station learning was not a basis for being transferred or teaching in the high school" is an exchange where Ms. Taylor stated that it "would be impossible" to transfer every UHS teacher not utilizing station-based learning. (Ex. F to Lineen Aff. at 54:23-55:3.) Needless to say, this statement does not compel the conclusion Cotnoir-Debenedetto seeks to draw, so the court considers the Defendants' consideration of Station Learning in the transfer decision undisputed.

Dickson, the Assistant Superintendent for Human Resources at the time of the transfers, (Defs. 56.1 Statement ¶ 6; Pl. 56.1 Statement ¶ 6), explained at her deposition, "what's most important is what the students need, and you put teachers who can address those needs, whose strengths address those needs." (Ex. H to Lineen Aff. at 36:20-24.)

Cotnoir-Debenedetto fails to provide any evidence of pretext alongside her "slight" case for an inference of discrimination. The record includes no direct evidence that the Defendants' explanation for the transfer is false, individual Defendants testified to this explanation, and it is further reflected in contemporaneous documentation. (*See, e.g.,* Ex. M to Lineen Aff. (Dkt. 39-13) at ECF 3 ("I have been in touch with Dr. Wolcott throughout this process and know that she would not make this decision unless it is in the best interest of the scholars. I appreciate all that you have contributed to the high school and I am excited to see this value shared with the middle school community."); Ex. N to Lineen Aff. (Dkt. 39-14) at ECF 3 ("Please be advised that transfers are made in accordance with the needs of the students in the district. In this case, after careful consideration of the needs of middle school students and with your professional and pedagogical strengths, the decision was made to transfer you. . . . You will be teaching entirely under your English 7-12 certification. The skills that you bring regarding PowerSchool training along with your teaching experience at the high school and your administrative internship will be just as applicable and beneficial to the middle school as you suggest they are to the high school.").) The only indirect evidence of pretext is the fact that Dr. Latty is Black, while Cotnoir-Debenedetto is white, and Cotnoir-Debenedetto's repeated claims that she was unqualified for teaching middle school while Dr. Latty was unqualified to teach high school. But repetition does not base these claims in the evidentiary record, and the undisputed facts support the Defendants' explanation that both Dr. Latty and Cotnoir-Debenedetto's qualifications and

background would serve the District's students post-transfer. And as discussed above, Cotnoir-Debenedetto's attempts to link New York state and the District's general policies of encouraging diversity in employment to this specific decision rely on misrepresentations of the record.

In the face of a clearly articulated, supported, and consistently stated non-discriminatory explanation for the transfers, Cotnoir-Debenedetto's unfounded belief that Dr. Latty, a Black woman, could only take her position due to racial bias is simply insufficient to support a jury verdict. On this evidentiary record, the court concludes that Cotnoir-Debenedetto's "claim of pretext is based on mere speculation." *Carvalho v. Assoc. Brands Inc.,* 707 F. App'x 742, 744 (2d Cir. 2017) (Summary Order). There is no evidence "to support a rational finding that the legitimate, non-discriminatory reasons proffered by the employer [was] false, and that more likely than not discrimination was the real reason for the discharge." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir. 1996). Accordingly, Defendants' motion for summary judgment is GRANTED on Cotnoir-Debenedetto's Title VII and NYSHRL claims.

## 2.  ADEA

The Defendants argue that Cotnoir-Debenedetto's claims under the ADEA also fail because there is no genuinely disputed issue of material fact regarding "make-whole remedies such as back pay, front pay, and reinstatement." (Mot. at 16 (quoting *Hatter v. N.Y.C. Hous. Auth.,* No. 97-9351, 1998 WL 743733, at *1 (2d Cir. 1998) (Summary Order).) "[T]he Court of Appeals have unanimously held . . . that the ADEA does not permit a separate recovery of compensatory damages for pain and suffering or emotional distress." *C.I.R. v. Schleier,* 515 U.S. 323, 326 (1995) (citing *Johnson v. Al Tech Specialties Steel Corp.,* 731 F.2d 143, 147 (2d Cir. 1984)). "[I]n the absence of an available remedy,

[an] ADEA claim must be dismissed." *Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F. Supp. 2d 176, 205 (E.D.N.Y. 2010).

Cotnoir-Debenedetto appears to concede that compensatory damages for lost wages or front pay cannot be proven, arguing simply that "Plaintiff is in fact seeking an effective reinstatement to her longstanding High School position." (Opp. at 16.) The undisputed facts illustrate that a damages remedy is not available: Cotnoir-Debenedetto lost no pay, benefits, title, or seniority when transferred to LRMS, so there is nothing to compensate. (Defs. 56.1 Statement ¶133-38; Pl. 56.1 Statement ¶¶ 133-38.) But Cotnoir-Debenedetto also concedes that she was returned to UHS for the 2022-2023 schoolyear. (Defs. 56.1 Statement ¶ 142; Pl. 56.1 Statement ¶ 142.) Accordingly, the claim for reinstatement is moot, and there is no remedy which Cotnoir-Debenedetto may seek and has not already received. Therefore, the motion for summary judgment regarding her ADEA claim is GRANTED.

## IV. CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment is GRANTED in full.

SO ORDERED.

Dated:   Brooklyn, New York
         June 2̶7̶, 2023

                                    s/Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge